## VanRenselaer T. Angell v. John J. Rosenbury.

*Assignment for the benefit of creditors : insolvency of assignee.*—In making a general assignment for the benefit of creditors, the utmost good faith is required of the debtor in selecting his assignee. The selection must be made with reference to the interest of creditors, rather than that of the debtor. Hence, if the assignee be so deficient in age, health, business capacity or standing, pecuniary responsibility or character for integrity, that a prudent man, honestly looking to the interest of the creditors alone, would not be likely to select him as a proper person for the performance of the trust, then his selection will furnish an inference, more or less strong, according to the circumstances, that the assignor was actuated by some other motive than a desire to promote the interest of creditors.

When a general assignment for the benefit of creditors is assailed as fraudulent, evidence of a general reputation that the assignee is insolvent is admissible, not only as tending to prove insolvency in fact, but also because, if the assignor has knowingly assigned to a person having the reputation of insolvency, this fact would have a tendency to show that the assignment was made for the purpose of inducing creditors to compromise, even though the assignor believed him solvent in fact.

*Witness giving reasons for his attention to the facts to which he testifies.*— A witness called to impeach such an assignment, testified that the assignor and assignee had requested him to assist in bringing about a compromise with the creditors, and had showed him notes upon which the assignee made a claim under the assignment. Being shown notes which had been produced on this trial as the same, he pointed out some differences in appearance, and stated that he gave particular attention to the notes first mentioned, as to their appearance, the ink, &c. Held that he might then be asked to state any reason or circumstance which induced him to do so.

*Proof of record without giving copy.*—The deposition of a register of deeds to the contents of deeds recorded in his office, without giving copies thereof, is inadmissible. And when the purpose for which it is offered is collateral to the issue, the rule is the same as in other cases.

ANGELL *v.* ROSENBURY.

*Presumption as to objection to incompetent interrogatories having been waived.* — Incompetent testimony having been taken on interrogatories and cross interrogatories under a commission, and the Court below having overruled objections thereto, the case was brought up for review on exceptions. On error, it was claimed by the party who had offered the evidence, that error could not be presumed, and as the record did not show how the interrogatories were settled, it must be presumed that objection was waived, and the putting of a cross interrogatory which called for and elicited evidence of the same nature was a waiver of any objections to the evidence brought out by the direct interrogatory. But it was held — nothing appearing to the contrary — that it must be presumed the interrogatories were settled in the usual way, under the statute and rules; and in such case the party may make objection to the competency of the evidence for the first time at the trial. *Comp. Laws,* §§ 4257, 4248.

*Request for instructions to the jury how construed.*—On error the Supreme Court must construe a request for instructions to the jury as it must have been understood by the Court and jury had it been given. It must therefore be construed in reference to the evidence in the case upon the subject to which it alludes.

*Assignment for benefit of creditors: badges of fraud.* — Where it appears that the assignee, a short time before the assignment, as an inducement for a third person to loan the assignor money, stated that the latter was perfectly good, and not owing much, the setting up by him of a large preferred claim under the assignment, as having been owing to him before such statements were made, is strong evidence of fraud in the assignment.

*Assignment by one who is solvent, or believes himself to be so.*—The mere fact of the solvency or insolvency of one who has made a general assignment, or his belief in the one or the other, does not necessarily render the assignment void. Without any fraudulent intent in either case it would be valid, and with a fraudulent intent it would be void in both cases alike.

*Assignment to prevent sacrifice of property.* — The fact that a general assignment is made by an embarassed debtor, whether solvent or insolvent, to prevent a sacrifice of his property, does not necessarily, of itself, render the assignment void. If the sacrifice is sought to be avoided for the sole purpose of giving creditors the benefit of the property, which in case of a sacrifice they would not be likely to obtain to the same extent, then, whether solvent or insolvent this is an honest purpose, and should not invalidate the assignment. But if the sacrifice is sought to be avoided for the purpose of enabling the assignor to reap a greater benefit, by securing a larger surplus, or retaining the control or use of the property, or in any other way, or for the purpose of compelling a compromise, then the purpose is fraudulent, and the assignment is void.

*Deed in trust may convey a fee without the word "heirs."* — In a conveyance in trust for the sale of land and for the payment of debts from the proceeds, the word "heirs" is not necessary to convey a fee. The trustee must be held to take an estate as large as may be necessary for the purposes of his trust, whether the conveyance contain words of inheritance or not.

*Heard October 30th & 31st, 1863. Decided January 8th.*

Error to Livingston Circuit.

*G. V. N. Lothrop,* for plaintiff in error :

1. The first question presented is, whether it is com-

petent to give evidence of the reputation of the assignor, for solvency or insolvency.

It is clear that it is the duty of an assignor to select a solvent responsible assignee ; his failure to do so is an indication of fraud ;— *Burrill on Assignments*, 66 ; 1 *Sandf. Ch.* 254 ; 1 *Barb.* 210 ; 1 *Binney*, 502 ; 8 *Paige*, 417.

The solvency of Rosenbury was ·therefore a material question. He lived in a distant State. He had no business here; and the very first questions that a creditor would ask, would be, Who is he? What his business ? What his standing and reputation, as to character and property, in Penn Yan ?

As these were answered would be the conclusion formed. And it is safe to act on these inquiries. A man may be reputed to be solvent, who is not in fact so. But a man who is really solvent, will never have a confirmed reputation of insolvency.

The return of an execution *nulla bona* would be unquestionably competent evidence ; yet it is undeniable that it would be much less satisfactory evidence among men of sound judgment, than a general settled reputation of insolvency. And as that evidence is competent which most satisfactorily proves the truth or falsity of a matter, reputation on this subject is competent by the highest test:— 1 *Greenl. Ev.* § 101 ; 2 *Dev.* 63 ; 11 *Wend.* 96 ; 18 *Vt.* 87.

And I maintain that this evidence is specially fit and appropriate, in cases where the assignor is bound to select a man who is not only in fact honest and responsible, but also one who is reputed to be such. He is bound to give his creditors obvious and ready grounds of confidence ; if he does not, if he appoints men whose moral and pecuniary reputation are such as to inspire distrust and alarm, then, certainly, this is a badge of fraud proper to be considered, both by the creditors, and by any tribunal investigating the validity of the assignment.

2. The next point is the refusal of the court to allow

the witness Hinman to state any answer or circumstance which called his special attention to the condition of the notes shown him by Wilbur and Rosenbury, at Wilbur's store.

The ground of this refusal, I certainly do not understand. As going directly to the weight of this testimony, it seems to me that the question could not properly be rejected.

3. The third point is presented in the deposition of Olmsted. He was allowed to state that he had found in the register's office, for Potter county, Pennsylvania, the records of certain deeds, and to give a statement of the contents thereof. This is clear error. A document or a record can only be proven by the original, or by copy: — 1 *Greenl. Ev.* §§ 83, 84, 85, 86, 501.

4. Rosenbury told Sexton, in the winter before the assignment, that Wilbur was not indebted to any extent, and tried to get him to lend Wilbur money. He said Wilbur was perfectly good.

When he showed the notes to Hinman, at the store, and at Harmon's office, he and Wilbur fixed the amount due on them at about $9,000. This was stated to enable Hinman to state to the New York creditors the amount of preferred claims, and to induce them to compromise.

Now, such conduct as this is the most direct and downright fraud. Yet under the charge of the Judge, the jury might well infer that such acts had no decided character in the eye of the law.

Stating fictitious debts by the assignor, has always been regarded as decisive evidence of fraud: — 1 *Sandf. Ch.* 83; 2 *Barb.* 9; 2 *Sandf. S. C.* 594; 36 *Barb.* 292.

And how strong the badge became under the evidence in this case!

As to badges of fraud, see *Burrill on Assignments*, 9

5. The fifth point arises on the request to the court

to charge the jury, that, if they found that Wilbur was solvent, or believed he was so when he assigned, then the necessary effect was to hinder, etc., and that the assignment was void.

I take it to be settled that where an assignment is made, not for the purpose of a distribution of the debtor's property, but primarily to delay creditors in their collections, it is fraudulent and void: — 3 *Barb. Ch.* 646; *Nicholson v. Leavitt,* 2 *Seld.* 516; *Buck v. Sherman,* 2 *Doug. Mich.* 176.

And it seems clear to me that when a solvent person makes such an assignment, the necessary and primary intent is to delay his creditors in their collections. He does this, also, for an advantage to himself, namely, to enable him to save a larger surplus out of his property.

I then take the broad ground, that no assignment by a solvent person, or one believing himself to be so, can be otherwise than fraudulent in the law. See *Kellogg v. Slawson,* 15 *Barb.* 56; *Ogden v. Peters,* 15 *Barb.* 560.

6. The Court refused to charge that the assignment conveyed only a life estate in the real estate.

This was error. No fee passes, or can pass by deed, without the word "heirs": — 1 *Bl. Com.* 83; — 4 *Kent,* 5.

And the Court also refused to charge that, if Wilbur intended to reserve the remainder to himself, the assignment was void.

When a debtor assumes to make a *general* assignment for the benefit of his creditors, he must convey *all* of his property. And it is especially fraudulent, if, under such an assignment, he purposely uses terms which will leave a part of the property in himself: — 11 *Wend.* 187; 1 *Hilton,* 462; 3 *Md.* 40; 8 *Md.* 418; 11 *Md.* 376.

*Wilcox & Waddell,* and *S. T. Douglass,* for defendant in error:

1. The evidence of hearsay and reputation to prove that Rosenbury was insolvent and irresponsible, was inad-

missible. To hold otherwise would be to introduce a new exception to the general rule excluding hearsay, not recognized by any authoritative text writer, or by any English decision, and against the general current of American authority: — 16 *Pick.* 567, 570; 13 *Geo.* 408; 25 *Ala.* 139; 9 *Ind.* 158.

2. The question to Hinman: "Will you state any good *reason* or circumstance which led you to give particular attention to the notes, the ink and the edges," was properly overruled.

*a.* It was improper in so far as it called for the witness's *reason* for scrutiny.

The state of his own mind — his *opinion* or *suspicion* that the notes were fraudulent or fictitious, and were made long after they purported to be — would have been good *reason* for scrutiny. A statement of such reason would have been a proper and natural answer to the question propounded, and the answer which the question was, doubtless, artfully designed to elicit.

It will not be claimed that any such *opinion* or *suspicion* could properly be given in evidence to the jury.

*b.* The question was, to some extent leading. That was not probably the ground upon which it was objected to, but as the grounds of objection are not stated in the bill of exceptions, any objection may be urged here which *could* have been urged on the trial: — 3 *Hill*, 396; 20 *Geo.* 140.

3. Olmsted's reply to the 4th interrogatory in respect to what conveyances to Rosenbury appeared of record in Potter Co., Pa., was properly admitted.

*a.* What lands Rosenbury owned in Pennsylvania was matter wholly *collateral* to the question in issue, and for this reason provable by parol, without the production or proof of his title deeds: — *Anth. N. P.*, 40; 10 *Johns.* 442; 11 *Wend.* 667; 17 *Mass.* 160; 2 *Bail.* 324.

*b.* What the 4th interrogatory was does not appear, nor does it appear whether the interrogatories were agreed

upon or not, nor whether, if agreed upon, it was with or without any saving of just exceptions; nor whether, if settled by a judge, any objection was made to this interrogatory at the time of the settlement. It does, however, appear that the defendant put a cross interrogatory, which called for and elicited the same evidence (only in more detail) elicited by the 4th direct interrogatory.

It must be presumed that the 4th direct interrogatory called for just the response which the witness gave to it: — *Francis v. Ocean Ins. Co.* 6 *Cow.* 404.

If such interrogatory was agreed to by the defendant without saving just exceptions, he would not afterwards be heard to object to the answer on the ground that it was secondary evidence.

And in the application of the general principle, that the ruling of a court admitting or rejecting evidence will be presumed right unless the bill of exceptions shows affirmatively that it was wrong (6 *Gray*, 510), it must in this case be presumed, in the absence of any showing on the subject, that the interrogatories were settled by agreement, without any saving of the right to except.

However settled, the defendant having made no objection to the 4th interrogatory at the time of the settlement, on the ground that it called for secondary evidence (for it can not be presumed that any such objection was made without any showing on the subject) and having himself propounded a cross interrogatory, calling for the same evidence, he must be deemed thereby to have waived any such objection to evidence elicited by the direct interrogatory:— 32 *Ala.* 500, 502.

Sec. 4257, Comp. L., does not apply where the party has either expressly or by implication waived his right to object.

4. The Court properly refused to instruct the jury "that if they should find that Rosenbury *made statements* before the assignment that Wilbur was not indebted to

any considerable extent, then the setting up the notes held by Rosenbury as just claims, *in*, *the assignment*, would be strong badges of fraud."

*a.* This instruction (unless unmeaning) would have been a direction to the jury to assume that Wilbur was not *in fact* indebted to any considerable extent, if they should find that Rosenbury had made statements to that effect. Whereas, Rosenbury's statements were mere *evidence* of the fact, which, however strong, was not indisputable.

*b.* It assumes that the notes were set up as just claims "*in the assignment*" to their *full amount, or for more than was due upon them;* whereas such was not the fact.

*c.* If it is claimed that the instruction merely assumes that the notes were so "set up" *under* and not strictly "in" the assignment (waiving the question of whether the language used will admit of this construction), we say, whether they were "so set up" was a question of fact for the jury, which the Court could not properly withdraw from their consideration, by assuming that they were.

5. The Court properly refused to instruct the jury that, if they found *either* that Wilbur was solvent, *or* that he believed he was so when he made the assignment, then the assignment was void.

That he was in fact solvent would not invalidate the assignment if made in good faith, and in the belief that he was insolvent.

Nor would his mere *belief* that he was solvent, when in fact he was not:— *Burrill on Assignments,* 41; *Ogden v. Peters,* 21 *N. Y.* 23; *Savery v. Spaulding,* 8 *Clarke,* (*Iowa*) 239.

To be solvent in such a sense that the fact could cast even a suspicion upon the good faith of an assignment, the debtor must be able *presently* to pay all his debts, by the application of all his means, or be in such a condition that his creditors can collect all their debts by legal process:— *Burr. on Assignments,* 38, 42.

ANGELL v. ROSENBURY.

The evidence does not tend to prove that Wilbur was in this sense *solvent*, or that he believed he was, but only that a few days after the assignment he expressed the opinion that the assigned property (the assignee being allowed time to dispose of it to the best advantage) would pay all his debts and leave a surplus.

6. The assignment conveys the fee of the real estate therein mentioned: — 15 *Md.* 63; 9 *Gill,* 261; 4 *Kent,* 304; 2 *Wash. Real Pr.* 186, 44.

CHRISTIANCY J.:

Rosenbury, the plaintiff below, sued Angell in an action of trespass, for taking and carrying away certain goods. Rosenbury claimed title under an assignment made to him by one Charles A. Wilbur, June 25th, 1855, ostensibly for the benefit of creditors. Angell, who was sheriff of Livingston county, had seized the goods under several writs of attachment at the suit of Wilbur's creditors. Wilbur, the assignor, appears to have been a merchant doing business at Howell, Livingston county, Michigan, for some time before the assignment, but his stock having run down in December, 1854, to about one hundred and fifty dollars in value, he then thought proper to replenish it by sending his clerk to New York and making purchases, through his agency, to the amount of about six thousand dollars, on six months credit; on which the clerk, who made the purchases, and testifies to them, is not aware that any thing had been paid at the time of the assignment.

Rosenbury, the assignee, was the brother-in-law of Wilbur, residing in Penn Yan, New York, where Wilbur had also resided till 1846; and Wilbur says Rosenbury had resided there for fifteen or twenty years, and he had known him for that period. His testimony shows an intimate acquaintance and considerable business transactions with him for a considerable portion of that time. Rosenbury had come out, in November or December, 1854, and

12 MICH.—Q.

spent the winter at Howell, and left in March or April, 1855; not having, so far as Wilbur knows, any business at that place. He however appears to have taken a friendly interest in Wilbur's affairs, as we find him during the winter urging one of the witnesses to lend Wilbur more money, saying he was perfectly good, and not owing much. About the time the six thousand dollars must have become due for [the December purchases, and three or four days before this assignment was executed, Wilbur, according to his own account, was on his way to Detroit to get an assignment prepared, when he unexpectedly, as he says, met Rosenbury on the road in the stage, on the way to Howell, as it would seem. Wilbur went on to Detroit, and seems to have got an assignment prepared; as he says, after his return from Detroit, he "had a new assignment" — the present one — drawn by Mr. Whipple, which was executed June 25th, 1855.

Rosenbury is made a preferred creditor in the assignment, the amount not stated, but stated to be "for notes and accounts not liquidated," though it appears from the testimony of Wilbur, who was sworn in his behalf, that Rosenbury had no claim except certain notes which he says amounted to $7000 or $8000, perhaps more. These notes, or what were claimed by plaintiff to be such — as subsequently produced under a notice for that purpose from the defendant below—were four, of one thousand dollars each, dated July 19th, 1845, payable to one Glover or bearer, in one, two, three and four years respectively, with annual interest, and one note for seven hundred and fifty dollars, given to Rosenbury March 9th, 1842, payable on demand. Against these notes Wilbur admits he had a large offset, for goods, boarding Rosenbury, &c., and calculated he did not owe much beyond the offset. The notes had never been renewed, nor any thing indorsed on them, nor any receipt given to apply on them. They had never settled, and the amount was not liquidated or

known at the time of the assignment, nor even at the time of this trial, in June, 1862, which seems to have been the third trial of this cause: and it does not appear whether any thing was due, or, if so, how much. Wilbur says he don't think there was a thousand dollars, and that at the time of the assignment he did not know whether he owed Rosenbury any thing or not. Rosenbury claimed that he did, and — to use his own words — he "might have owed him considerable or not." All this came out on his cross examination, at the beginning of which he had testified that the preferred claim of the plaintiff was just: that is, what was due; but he didn't know how much was due him.

The defendant below, claiming the assignment to be fraudulent as to Wilbur's creditors, undertook to impeach it by showing that Rosenbury, the assignee, was insolvent. For this purpose he introduced the depositions of several business men of Penn Yan, where Rosenbury resided, and who had known him from 1840 down to about the time of the assignment, all of whom testified fully to his reputation for insolvency during that period. Upon this point as well as the witnesses' means of knowledge, the depositions were full and clear. But to so much of these depositions as related to his reputation for insolvency, the plaintiff below objected; and the Court sustained the objection and excluded the evidence. This is the first question for our consideration.

While we express no opinion whether insolvency, as a legal status, can be proved by reputation when that is the direct question in issue, we are entirely satisfied that the testimony was admissible in the present case on more than one ground. *First*, — though the point can hardly be said to be necessarily involved in the present case — we think it was admissible as tending to show insolvency in fact. The fact of insolvency is one in its own nature, in most cases, hardly susceptible of direct or positive proof. Clear

knowledge of the fact must generally be confined to the party whose insolvency is in question — who in the present case is the plaintiff himself — (and though under our present statute he may be sworn as a witness, we can not hold the defendant bound to resort to that mode of proof more than before the statute, especially as he may be sworn in his own behalf to rebut any proof defendant might introduce). The fact, then, must generally be proved by circumstantial or presumptive evidence — by the proof of other facts from which insolvency is to be inferred. Among the particular facts admissible for the purpose, and thought to be of much weight, and most generally resorted to, is the return of an execution against the party unsatisfied. And yet as an execution does not reach rights in action, nor (in this and most other states) mere trusts; and as the defendant may have any amount of money and even other property so situated as not to be found or reached by the officer, it is easy to see that the defendant in the execution may be (and it is notorious that he often is) a wealthy man in fact, notwithstanding the officer has been entirely unable to find property subject to execution. This is so well understood that the return of an execution unsatisfied would, alone, seldom, if ever, give a man a general reputation for insolvency. Any thing like a common or general reputation for insolvency would not be likely to arise without the observation of numerous other facts, such as the acts and conduct of the party for a considerable length of time, indicating a want of means, and an inability to pay his debts. And as we know from common experience that, though men really insolvent often appear to the public for a considerable time as men of property, very few, if any, ever get a general reputation for insolvency who are not insolvent in fact; we think the general reputation of a man as insolvent in the neighborhood in which he resides, and among men whose dealings and interests prompt them to

observation and inquiry, is much more satisfactory evidence of insolvency than that of the particular facts most generally relied upon for the purpose; especially where, as in the present case, such has been the unquestioned reputation of the man for a great length of time. It is the deliberate judgment of the community — based upon the observation of a much greater number of facts than it can generally be practicable to introduce in evidence.

But the purpose for which the evidence was introduced in the present case did not require proof of the absolute insolvency of the plaintiff, as a legal status. The evidence was material only so far as it tended to prove a fraudulent intent in making the assignment.

The right of an embarrassed debtor to make an assignment, and to select his own assignee, without, and against, the consent of his creditors, has been finally admitted, in most of the states of the Union; though the propriety of recognizing such a right has often been questioned, and, if the question were a new one, might well be doubted. But to prevent the abuse of the right, and to avoid its being made a convenient engine of fraud, the utmost good faith must be required of the debtor in the selection of the assignee. That selection must be made with reference to the interest of creditors, rather than that of the debtor. Hence, if the assignee be so deficient in age, health, business capacity or standing, pecuniary responsibility or character for integrity, that a prudent man honestly looking to the interest of the creditors alone, would not be likely to select him as a proper person for the performance of the trust; then his selection will furnish an inference more or less strong, according to the circumstances, that the assignor, in making the selection, was actuated by some other motive than the desire to promote the interest of creditors: in other words, an inference of intent to hinder, delay or defraud his creditors. And this inference will be strengthened if the assignee be a clerk or near relative,

or a person likely to be easily influenced by the assignor; as this would tend to raise a presumption that the assignment was intended to be made use of for the assignor's benefit, or that there was some secret trust in his behalf. Any thing, therefore, which tends to show that the assignee, in any respect, is not such a person as an honest and prudent man would be likely to select for the position, with reference to the interest of creditors, must, upon principle, be admissible to impeach the good faith of the assignment: (the weight of the evidence would, of course, depend upon the degree of unfitness shown). In this view it is well settled that the selection by the assignor of a person known to him to be insolvent, is very strong evidence of a fraudulent intent. This is upon the principle that, as the assignee is not by law compellable to give security for the assets, or the faithful performance of the trust, the assignor, in placing the property beyond his own control and that of his creditors, ought to place it in the hands of such person as will be able to respond to creditors for the waste or wrongful disposition of the assets, or the mal-administration of the trusts. The principle, therefore, is not confined to actual insolvency, but extends to any case where the property or pecuniary means of the assignee are clearly inadequate to this end, or any state of pecuniary embarassment likely to deprive the creditors of this security. Not that this consideration, of itself, is always a controlling one, or decisive of the question of fraud; as the high character of the assignee for integrity and business capacity may sometimes compensate, in a great measure, if not entirely, for his want of pecuniary means, and afford nearly, if not quite as strong assurance to creditors that the fund will be safe in his hands, and that the trusts will be faithfully executed.

The inquiry, therefore, is not so much whether the assignee is strictly, in a legal sense, insolvent, but what is

the state of his property and his pecuniary standing? And upon principle, as well as authority, we think this may be proved by reputation. See *State v. Cochran*, 1 *Dev.* 63; *Hard v. Brown*, 18 *Vt.* 87; also *Heywood v. Reed*, 4 *Gray*, 574.

Decisions have been cited to the contrary where the question arose somewhat as it does here. But we think the decisions above cited are founded upon the better reasons. In Alabama proof of insolvency by reputation is rejected, on the ground that insolvency is a legal condition — a conclusion of law from particular facts — and yet in the cases in which it was so held, it is not easy to see how it was any more a conclusion of law from particular facts, than fraud in the present case, or character in ordinary cases, is a conclusion of law from the particular facts which go to establish the general resultant fact of fraud. or character. But, while the courts of Alabama reject proof of insolvency by reputation, yet, with a singular inconsistency, as it seems to me, they allow the particular facts from which insolvency is to be inferred, to be proved by reputation; which, I think, is much more objectionable, both upon principle and authority.

But *second*, I think reputation of insolvency is admissible in cases like the present, independent of its tendency to prove insolvency or a less degree of pecuniary embarassment in fact. It is well settled that an assignment made by a debtor for the purpose of inducing a compromise on more favorable terms than he could otherwise obtain, is fraudulent. Now, whatever may be the condition of an assignee as to solvency, as known to himself: creditors have not his means of knowledge, and they must judge of the fact as it appears to the public — in other words, mainly by reputation. It is upon this they must generally form their judgment, and decide upon their course, whether it is best to run the risk of a suit, or to assent to such compromise as the debtor may choose to offer. And if

the assignee has a confirmed reputation for insolvency, we can not fail to see, that all prudent creditors would be much more likely in ordinary cases to consent to a compromise on the debtor's own terms, than if the assignee were reputed to be solvent, and able to respond for malversation or breach of trust. In this view we can not resist the conclusion, that, if the assignor has knowingly assigned to a person having the reputation of insolvency, this fact would have a tendency to show that the assignment was made for the purpose of inducing a compromise, even though the assignor believed him solvent in fact (and there was certainly enough in the case to authorise the jury to infer a knowledge on the part of Wilbur of this reputation of Rosenbury); and this tendency would be greater or less, according to the character or fitness of the assignee in other respects, and the other circumstances of the case. But its tendency to prove that such was the purpose of the assignment would be very strong, when, as in this case, the assignor and assignee are shown to have acted together in their endeavors to procure a compromise, after the assignment was made. We think, therefore, the Court erred in excluding the depositions referred to.

The next error assigned is the rejection of the question put to the witness, Hinman, asking him to state any reason or circumstance which led him to give particular attention to the four notes. To understand the nature of this objection it is necessary to see how the question arose. Hinman had already testified that, in August, 1855, he was applied to by the *plaintiff and Wilbur* to aid in getting a compromise with the New York creditors. He told them that, to enable him to do so, they must make a statement of their matters; and they showed him four notes, as the basis of the plaintiff's claim. In this stage of the trial, as it would seem, while Hinman was still under examination as a witness, the plaintiff, under a notice from the defendant to produce the notes, produced the

five notes which I have already described. The witness, after looking at the notes, testified, "I can not state whether the notes now produced are the same which were shown me by the plaintiff or not. If they are, I was mistaken in the date. My recollection is, that the four $1000 notes shown me were dated June 15th, 1842. The same notes were soon afterwards shown me at the office of Harmon. The $750 note has the same appearance as the note just shown me. The other four differ in my recollection in the appearance of the paper and date. Those first shown me were clean. These are more dilapidated and worn. I gave the four notes particular attention as to their appearance, the ink, and the edges." He was then asked, on the part of the defendant, " Will you state any reason or circumstance which led you to do so ? " This was objected to, but the grounds are not stated, and the question was rejected.

We think the rejection of this question was erroneous It was very important, in determining the credit to be given to the witness's recollection, to know whether any or what reason existed at the time to induce the witness to give particular attention to the appearance of the notes. The value of his recollection would depend entirely upon the degree of attention with which he observed the facts, and the reasons which operated upon his mind to excite that attention, and to fix the facts in his memory. He should therefore have been allowed to state any facts which had that effect, whether relevant to the issue or not. The rejection of the question was unfair both to the defendant and the witness. We see nothing objectionable in the form or substance of the question. It was not leading: and the generality of its form was in some measure necessary to avoid suggesting any particular answer.

The next error assigned is the admission of the deposition of Olmsted, the register of deeds of Potter county, Pennsylvania, testifying to the contents of certain deeds to

the plaintiff, Rosenbury, there recorded. This evidence was offered to rebut the evidence on the part of the defendant tending to prove the insolvency of the plaintiff, or his want of property. No deed nor any copy of a deed was proved or attached, nor was any offered in evidence. The testimony is claimed to be admissible on the ground that the question of Rosenbury's title was only collateral to the issue. But the question upon this testimony is not one of reputed ownership, but simply whether *the contents* of the deed or of the record could be proved by parol. We understand the rule to be well settled that, when the contents of a deed or other writing are to be proved, though only collateral to the issue, the rule is the same as when the matter is directly in issue: and the same ground must be laid for the introduction of parol evidence: — *Cow. & Hill, Notes to Phil. Ev.* (*Ed. of* 1839) *note* 452 *pp.* 1210 *to* 1212. *Same work by Edwards, vol.* 2 *pp.* 512 *to* 514; 1 *Greenl. Ev.* §§ 88, 89.

But as the deposition was taken upon written interrogatories under a commission, and there was a cross interrogatory upon the part of the defendant which called for and elicited evidence of the same nature, and it does not appear whether the interrogatories were agreed upon, or whether, if so, it was with or without the reservation of exceptions ; or whether, if settled by the Judge, any objection was made by the defendant; it is urged that it must, on error, be presumed that no objection was made, and the putting of the cross interrogatory was a waiver of any objections to the evidence elicited by the direct interrogatory.

Though it is for the plaintiff in error to show by his bill that error has been committed, we do not think it was necessary for him to set forth the negative fact, that he had not agreed to the direct interrogatories, as framed, or that he had not consented to waive any objections, unless something appears in the bill to indicate that he had done so; and nothing of this kind appears here. There

is nothing in the bill to indicate that the deposition was taken or the interrogatories settled by agreement, or in any other than the usual and legal way pointed out by the statute and rules of Court: and the presumption must be that the deposition was taken and the interrogatories settled in this way, until something appears in the bill to indicate the contrary. If the objection had been waived by agreement, so important a fact, so decisive against the objection, and which must have been so directly before the mind of the Judge in deciding upon the objection and in settling the bill, we can not suppose would have been omitted without imputing to the Judge a want of ordinary intelligence, as well as of candor and fairness. We must therefore treat it as a deposition taken under the statute and rules of court.

By reference to *Comp. L.* § 4257, it will be seen that " any objection to the competency or credibility of a witness so examined, or to the competency or relevancy of any question put to him, may be made in the same manner, and with the like effect, as if such witness were personally examined at such trial." *See also in connection, Ibid.* § 4248. This, we think, reserves to the party the right to make his objection for the first time at the trial, though he may have been present when the interrogatories were settled, and may have put cross interrogatories upon the same matter: and that the putting of such cross interrogatory is no waiver of the objection to the direct interrogatory to which it relates. Such has been the course of decision in the state of New York under a statute substantially like ours. *See Fleming v. Hollenback,* 7 *Barb.* 273; *Morse v. Cloyes,* 11 *Barb.* 100 ; *Commercial Bank of Penn. v. Union Bank,* 11 *N. Y.* 203. The same practice seems to exist in Ohio and in South Carolina, and, as I infer, without any special provision of statute. *See Cowan v. Ladd,* 2 *Ohio N. S.* 322; *Ellis v. McBryde,* 9 *Rich.* 269 : and by statute in Massachusetts in

cases where the depositions are not taken on written interrogatories, though both parties are present at the taking :—*Atlantic & Marine Fire Ins. Co. v. Fitzpatrick*, 2 *Gray*, 279 ; *Heywood v. Reed*, 4 *Gray*, 574; *Palmer v. Crook*, 7 *Gray*, 418 : *and see Lord v. Moore*, 37 *Me*. 208. It is true our statute does not, like those of Massachusetts and New York, *expressly* reserve the right to object to the *answer*. But we think the right to object to the question *on the trial*, must also extend to the answer: and if it be said that the right to object to the answer must depend upon the question being objectionable, still, though the interrogatory does not here appear, it must be presumed to have called for the answer the witness gave it:—*Francis v. Ocean Ins. Co.*, 6 *Cow*. 415. If the direct interrogatory and the answer to it be rejected, as incompetent, the cross interrogatory and answer, being dependent upon it, must also be rejected :—*Ellis v. McBryde, supra; Fleming v. Hollenback*, 7 *Barb*. 273. (The last case was overruled in *Cope v. Sibley*, 12 *Barb*. 521, upon another point, but not upon any question involved in the present case.) We think therefore the deposition of Olmstead, so far as it purported to state the contents of the deeds mentioned, was erroneously admitted. The next error assigned is the refusal of the Court to charge, that, "if the jury should find that Rosenbury made statements before the assignment that Wilbur was not indebted to any considerable extent, that the setting up of the notes held by Rosenbury, as just claims in the assignment, would be strong badges of fraud." The language of this request has been criticised by the counsel for the defendant in error. Its grammatical accuracy will hardly be insisted upon, and perhaps it is open to the criticism that it does not, abstractly considered, express the idea intended to be conveyed. But we think it fair to construe a request of this kind as it must have been understood by the Court, and by the jury had the charge been

given as requested. For this purpose it should be con-
strued with reference to the evidence in the case upon the
subjects to which it alludes. When considered in this
light, though it may fall short of expressing the whole
proposition intended, we think it was a sufficiently intelli-
gible expression of a proposition which the defendant was
entitled to have embodied in the charge. Saxton had tes-
tified that, in the winter previous to the assignment, plain-
tiff in Wilbur's store had asked the witness why he did
not lend Wilbur more money, saying Wilbur was perfectly
good and not owing much. Hinman testified that, at the
first interview with plaintiff and Wilbur, in August, 1855,
they both fixed the amount due plaintiff (meaning, as the
former portion of his testimony shows, upon the notes), at
nine thousand dollars; and that at a subsequent interview
at Harmon's office, plaintiff stated his claim at the same
sum. This was stated as the amount of the plaintiff's
preferred claim, under the assignment, and to enable Hin-
man to effect a compromise with the New York cred-
itors; and must of course have been intended to be
communicated to these creditors as an inducement to a
compromise. When the request is construed with reference
to this evidence, to which we think it must have been
understood by the Court and jury to relate, it must, we
think, be understood as a request to charge, that, if the
jury should find the plaintiff had made the statements
testified to by Saxton, then the setting up of the notes as
just claims in or under the assignment (the difference in
the propositions will not materially alter the sense) in the
manner stated by Hinman, would, if found true, be "a
strong badge," or a strong indication or evidence, of fraud
(for this is the sense in which "badges of fraud" are
used): *see Burrell on Assignments*, 433, 434.

We do not think this request fairly open to the objec-
tion urged, that it required the jury to assume that Wil-
bur was not much indebted in fact, if Rosenbury should

be found to have so stated. If this fact (that he was not much indebted) were established, then the setting up of the notes in the manner and to the amount stated by Hinman, would, if found true, not only be a badge, or evidence of fraud; but would of itself constitute fraud. The request, however, only asks for a charge that it would be evidence of fraud. Nor do we understand the request as requiring the jury to assume that the notes were in fact " set up ". The language is " the setting up the notes *would be* " (not was or is) strong badges of fraud : leaving, as we think, the jury to determine whether they were thus set up. The request would have been more logical in form had it been that the statement of Rosenbury referred to, *and* the subsequent setting up of the notes— should the jury find both these facts — would be strong badges (or evidence) of fraud. But such, we think, was the effect of the request ; as both facts were left to the jury, and the latter fact was not asked to be treated as evidence of fraud without the finding of the former.

The statement of Rosenbury alluded to would tend strongly to show that Wilbur could not have been indebted to him in the amount of nine thousand dollars upon the notes, the amount at which the testimony of Hinman tended to show they were set up by both the assignor and the assignee. The request does not require the jury to assume that, if set up, they must have been set up for more than was due, but this is what the evidence of Rosenbury's statements and of the setting up of the notes for nine thousand dollars as stated by Hinman tended to show.

If, however, the bill states all the evidence upon the point of Wilbur's indebtedness to Rosenbury, it was the duty of the Court and jury to assume that there was not nine thousand dollars due on the notes, and that if set up as stated by Hinman the notes were set up for more than was due. It appeared from the plaintiff's own showing

(for the testimony of Wilbur on cross examination must be treated as evidence on the part of the plaintiff), that not more than one thousand dollars, if anything, was due. And so far as the bill shows, this fact was undisputed. If, therefore, the record shows all the evidence upon the point, the defendant, had he asked it, would have been entitled to a charge that the setting up of the notes as stated by Hinman, would, if found true, be strong evidence of fraud, whether the jury should find Rosenbury had made the statement in reference to Wilbur's indebtedness alluded to or not. We think, therefore, the defendant was entitled to the charge asked.

Did the charge given in answer to the request cure the error of its rejection? This charge was "that, if the jury find that plaintiff stated, before the assignment, that Wilbur was not indebted to any considerable extent; then, in deciding whether the transaction was fraudulent or not, they should take into consideration the fact that the plaintiff set up the notes as just claims in the assignment, *as well as all other facts* in the case." This charge certainly exhibits an extreme of delicate forbearance entirely uncalled for by the case, or the question of fraud involved: since, with apparently studious care, it avoids telling the jury that the setting up of the notes under the circumstances stated would be evidence of fraud, or whether its tendency would be to prove the transaction fair or fraudulent. Perhaps the charge may not violate any principle of law in any rule which it lays down. And the setting up the notes in the manner and to the amount supposed would so palpably indicate fraud, that a jury would not, under ordinary circumstances, be in any danger of misapprehending the effect of the evidence. But such a charge coming immediately upon the refusal of the Court to charge that such conduct would be evidence of fraud, was certainly calculated to make them doubt whether such

was its tendency, or whether in law it was to be regarded as having any decided tendency one way or the other.

It is further assigned as error, that the Court refused to charge, "that if the jury find that Wilbur was solvent, or believed himself to be so, when he made the assignment; then the necessary effect was to hinder, delay and defraud creditors, and the assignment is void."

We think this charge was properly refused. We can see no good reason to hold that the mere fact of the solvency or insolvency of the assignor, or his belief of the one or the other, must necessarily render the assignment void. *Without* any fraudulent intent in either case it would be valid: and *with* a fraudulent intent it would be void in both cases alike. Nor will the fact that the assignment is made by an embarrassed debtor, whether solvent or insolvent, to prevent a sacrifice of his property, necessarily, and of itself, render it void. It will depend upon the purpose with which the sacrifice is sought to be avoided. If for the sole purpose of giving his creditors the benefit of his property, which, in case of a sacrifice, they would not be likely to obtain to the same extent, then, whether solvent or insolvent, this is an honest purpose, and should not invalidate the assignment. But if the sacrifice is sought to be avoided for the purpose of enabling the assignor to reap a greater benefit by securing a larger surplus, or retaining the control or use of the property, or in any other way, or for the purpose of compelling a compromise; then the purpose is fraudulent, and the assignment is void. *See Ogden v. Peters,* 15 *Barb.* 560; *same case on appeal,* 21 *N. Y.* 23; *Rohenbaugh v Hubbel, cited,* 15 *Barb.* 560.

But the fact of the solvency or insolvency of the assignor, or his belief of the one or the other, may not be wholly immaterial. A person believing himself solvent might be more likely to seek to avoid a sacrifice for the purpose of securing a surplus to himself, than one who

believed himself to be insolvent, as the inducement to this end might perhaps be stronger : and therefore it might require less evidence in such a case to authorize the inference of such an intent, than if he believed himself insolvent. But this may admit of doubt.

The only remaining exception is, the refusal of the Court to charge " that the assignment conveys only a life estate in the real estate therein mentioned; and if the jury believe that Wilbur intended to reserve the remainder to himself, the assignment is void."

The assignment "grants, bargains, sells, releases, assigns and sets over to the said John J. Rosenbury, and to his assigns forever" (omitting the word heirs), all and singular the lands, tenements and hereditaments, real estate and chattels real (as well as his personal property, notes, accounts, &c). The habendum is, "to the said John J. Rosenbury, and to his assigns, in trust however, and to and for the uses, intents and purposes following : that is to say, the said John J. Rosenbury shall take possession of the said property, and shall with all convenient diligence, sell and dispose of the same, either at public or private sale, to such persons, &c., collect debts &c., and convert the same into money," &c. And it is further provided that said Rosenbury, with the avails and proceeds of said sales and collections, shall first pay and discharge the costs and expenses attending the due execution of this assignment, and the carrying into effect the said trusts, with a reasonable compensation for his own services : and the residue of the avails and proceeds of said sales and collections shall constitute a fund to be used and applied by said Rosenbury for and towards the payment of the debts owing by said Wilbur: which debts he shall pay and discharge in the order " therein set forth." Nothing is expressly reserved to the assignor except what may remain after the payment of all his debts of every kind. And the assignor covenants with the assignee "and his assigns,"

12 MICH.—R.

that "he will, when thereto required, make and cause to be made such further arrangements, deeds and conveyances as shall be necessary to carry into full effect this indenture, and the intention of the parties to the same."

This, therefore, is a conveyance *in trust for the sale* of the land and real estate (as well as of the personal property), and for the payment of debts from the proceeds. In such a case we do not think the word "heirs" is necessary to convey a fee. When a conveyance of land is made in trust for such a purpose, we think the trustee must be held to take an estate as large as may be necessary for the purposes of his trust, whether the conveyance contained words of inheritance or not:— 2 *Washb. on Real Property*, *pp.* 186, 187, §§ 43 and 44; 4 *Kent*, 304; *Farquharson v. Eichelberger*, 15 *Md.* 63; *Spessard v. Rhorer*, 9 *Gill*, 261. There is certainly nothing in the instrument indicating an intent that the sale to be made by the assignee was to be of any particular estate or interest less than the whole. We are therefore satisfied that this request was properly refused. But for the several errors upon other points, the judgment must be reversed, with costs of this Court to the plaintiff in error; and a new trial must be granted.

MARTIN CH. J. and MANNING J. concurred.

CAMPBELL J. did not sit in this case.