STATE OF MAINE *vs.* ROYDEN V. BROWN.

Kennebec.    Opinion, July 16, 1946.

*Henry H. Heselton,* County Attorney,

*Abraham Breitbard,* Deputy Attorney General, for the State.

*F. Harold Dubord* and

*Burleigh Martin,* for the respondent.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MURCHIE, TOMP-KINS, FELLOWS, JJ.

THAXTER, J. This case is before us for the second time. In our first opinion, *State* v. *Brown,* 142 Me., 16, 45 A., 2d, 442, we sustained certain exceptions but did not consider the appeal and expressed no opinion as to whether the evidence in the record then before us would have sustained the verdict of the jury. The respondent was tried before a jury in the Superior Court on an indictment in which he was charged with taking indecent liberties with the sexual parts or organs of one John McAuley, Jr., a male child under the age of sixteen years. As at the first trial he

was convicted and the case is before us on an appeal from a denial by the presiding justice of his motion for a new trial and on exceptions to the admission of certain evidence.

## The Appeal

The issue on the motion for a new trial addressed to the presiding justice was, to use the language from *State* v. *Dodge*, 124 Me., 243, 246, 127 A., 899, 901,

"Whether upon all the evidence the jury was warranted in arriving at their verdict in finding the respondent guilty beyond a reasonable doubt, having in mind that it is for the jury to determine the credence to be given the witnesses and the weight of their testimony."

The appeal, taken in accordance with the provisions of R. S. 1944, Chap. 135, Sec. 30, brings before this court the question whether the presiding justice correctly decided that issue.

We shall endeavor to summarize the salient points in the evidence which is sharply conflicting. For the state there was the testimony of John McAuley, Jr., the victim of the alleged advances by the respondent, of his father, John McAuley, Sr., of Joseph F. Young, Jr., deputy chief of the Maine State Police, of Charles A. Watts, the sheriff of Kennebec County at the time the alleged offense was committed, and of James L. Coakley, an elevator operator in the State House at the time. The evidence for the respondent was the testimony of himself, of his wife, Naomi B. Brown, and of Delmont T. Dunbar, a newspaper reporter. If the jury believed the testimony of John McAuley, Jr., as they apparently did, the respondent was properly found guilty. McAuley, a large, well-developed boy of fourteen, testified that on March 6, 1945, after school had been dismissed at one-thirty, he played basketball in the school gymnasium and then went to the State House to work for his father, who was the proprietor of a restaurant in the basement of the building. He did cleaning and washing in the kitchen of the restaurant until the arrival of

his father at about six o'clock with provisions which he helped him unload. While he was removing these from his father's car, which was parked near the rollway which led to the basement of the State House, the respondent, who was secretary of the State Senate, and his wife drove up and entered the building through that entrance. The boy entered just behind them, went with his load to the storeroom, which is near the kitchen, and saw the respondent talking to Mr. McAuley, Sr. in the kitchen. In a very short time Brown left the kitchen and passed by the storeroom. Young McAuley, when he had finished, left and went out for another load. The course by which he had entered and left took him through a so-called pressroom, where papers are pressed, and thence to the door leading out to the rollway. Off this pressroom was a room which had been the old kitchen for the restaurant. He says that as he passed by the door to this room on his way out, the respondent asked him if this wasn't the old kitchen which his father used to have. As he stepped through the door to look at it, Brown made an improper remark to him, pushed him over by the sink, undid the fly of his trousers, and put his hand on McAuley's private parts. Brown then asked him how old he was and the boy said: Fourteen." Just about then his father called to him and Brown left the room by a back entrance. The boy made no outcry, and when the respondent left, went back to the kitchen and continued to work with his father. On the way home he told his father of what had happened. There was a light in the pressroom but none in the kitchen where the incident took place. Such is the boy's story of what happened.

The boy's father corroborated his son's story as to what occurred prior to the commission of the alleged offense. He says that the boy told him of the episode on his way home. The next day, which was Wednesday, Mr. McAuley, Sr. notified the state police.

Deputy Chief Young of the state police told of the arrest of the respondent by Sheriff Watts in the office of the attorney general at noon on March 9th. Brown said he thought he should

have counsel, and asked that he might talk with Mr. Young alone. In the conversation which ensued between them, which was afterwards repeated to Sheriff Watts in the presence of the respondent, the respondent in response to questions said that he remembered the evening of March 6th, of talking to John McAuley, Sr. in the kitchen of the restaurant, of talking to young McAuley near the rollway about some packages, and then Mr. Young relates the following conversation: "I asked if he remembered being in the door of the old kitchen and fooling around with the fly of John McAuley, Jr.'s trousers and he said he did not remember, but did remember pushing him." Brown finally said that he would like to talk to the boy and see if he couldn't "straighten this thing out."

Sheriff Watts merely corroborated the testimony of Mr. Young as to the conversation which took place with the respondent while the sheriff was in the room.

Such is the salient testimony for the state.

The respondent testified that his wife drove him to the State House about quarter past seven in the evening of March 6th; that they left the car near the rollway, and saw John McAuley, Jr. near his father's car and spoke to him; that the boy followed the respondent and his wife into the building and went by them; that the respondent gave the boy a push on the shoulder as he went by; that the respondent, leaving his wife standing in the corridor, went on to see the father who was by the kitchen door about breakfast the next morning; that he spoke to him for just a moment, during which time the boy was putting the goods away in the storeroom; that he then went back and joined his wife and saw the boy pass out of the storeroom and go toward the pressroom, and that thereafter he did not see the boy again that night; that he and his wife walked together toward the elevator which they took to the Senate floor; that he unlocked his office door and was there with his wife until about quarter of nine when he left the building and went to the Augusta House. He says that at all times, apparently until he got to his office, he was dressed in

heavy winter clothes, an overcoat, muffler and gloves. He denies specifically that he went back to the pressroom that night, or that he saw the boy, or spoke to him again or committed the act which the boy claims he did. The next morning he ate breakfast in the State House restaurant. At the time he was called to the office of the attorney general on Friday, he asked to see the warrant and suggested that the matter be left for the grand jury which would be summoned after the legislature would have adjourned. He said he had no recollection of Mr. Young asking him whether he had fooled around young McAuley's fly; and when asked whether he remembered the conversation between himself and Mr. Young being repeated to Sheriff Watts, he merely said he didn't remember everything.

Mrs. Brown, who was employed in her husband's office, corroborated him in every particular. She said that at no time during the evening in question were she and her husband separated except when he went to the kitchen to talk to John McAuley, Sr. and that while he was there for about a minute and a half she heard the conversation between them. Her husband, she said, went up with her in the elevator, opened the office door for her, and they were there together until a quarter of nine.

The testimony of Delmont T. Dunbar, who was called by the defense as a witness, does not seem to be important on any fundamental issue of the case.

In rebuttal the state called James L. Coakley, an operator of the elevator in the State House, who testified that on the night of March 6th he went on duty at five o'clock in the afternoon; that Mr. and Mrs. Brown on that night did not come up in the elevator together, but that Mrs. Brown went up alone and was followed by Mr. Brown about six or seven minutes later. He remembered this, he said, because it was their custom always to come in together and ride up together. He stated that he remembered that it was the night of March 6th, because about a half or three quarters of an hour after they went up it was brought to his attention that something unusual had happened. The wit-

ness did not remember anyone else he took up that night. He said that Mr. and Mrs. Brown went up in the elevator the night before.

Mrs. Brown on being recalled testified that she and her husband came back late from Skowhegan the night before and did not go to the State House at all. She said that on another night, the latter part of February, when her husband was at a fraternity dinner, she did go up in the elevator alone.

Respondent's counsel argues the improbabilities of the commission of such an offense under the particular circumstances existing at the time. What happened was certainly not planned and was, even according to the state's theory, over in a very few minutes. The victim of the respondent's alleged advances made no outcry, went about his work, and, it may be argued, treated the matter in a sense lightly. We have his testimony against that of the respondent and the respondent's wife; for if either Brown or Mrs. Brown gave a correct account of what happened that evening no such occurrence could possibly have taken place. But the boy has told at all times a consistent story, and no motive is apparent why he should make it up. If the elevator operator is correct in his dates and in giving six or seven minutes as the interval which elapsed between the time when Mrs. Brown and the respondent went up in the elevator, all that the state claims did happen could have happened. According to the story of Deputy Chief Young as to the conversation he had with the respondent, which according to both him and Sheriff Watts was repeated to the sheriff in the presence of the respondent, the respondent remembered all the happenings of that evening in great detail with the exception that he could not remember that he touched the fly of the McAuley boy's trousers. Would not the reaction of an innocent man to such an inquiry be: "I did no such thing"? There would be eagerness to deny, not forgetfulness.

The respondent's inquiry of the boy as to his age is important. He was a lawyer and a municipal court judge. The boy was not. The respondent undoubtedly knew that he was guilty of the

statutory offense only in case the boy was under the age of six-
teen years. For us to assume that young McAuley knew the sig-
nificance of his age and deliberately lied as to this inquiry is to
impute to him a knowledge of the law and a devilish cunning
which it is quite obvious he did not have.

In arriving at the truth in such a case as this, one of the most
important factors is the opportunity that a jury has to see the
principals involved, to hear their testimony, to observe their
demeanor on the stand, to evaluate the testimony of witnesses
from the spoken word instead of from the printed pages of a
record. It was the jury's province to resolve conflicting testimony
and to determine where the truth lay. We cannot say that they
manifestly erred. Their verdict must stand.

### The Exceptions

James L. Coakley, the operator of the elevator, testified that
on the night of March 6th, 1945, Mr. and Mrs. Brown did not
come up in the elevator together. This was very material testi-
mony. It was important, almost essential, that the state should
be able to establish that on the evening of March 6th they rode
in the elevator at separate times. The witness was permitted to
establish this fact, firstly, by testifying that it was their custom
to come in together and that on this occasion they did not do so,
and secondly, in order to fix the time as March 6th, the witness
was asked the following question and gave the following answer:

"Q Now what else if anything happened that night that
impresses you with March 6th as the date when Mr.
and Mrs. Brown separately went up in the elevator?
"A Well, I hesitated when I took Mrs. Brown up in the ele-
vator a minute thinking Mr. Brown would come. He
didn't, so I brought her up alone. Then I came back
down again and in a little while afterwards, perhaps six
or seven minutes, Mr. Brown came along and I took him
up. After that, possibly half or three-quarters of an hour

or so, it was brought to my attention something had happened out of the ordinary."

Counsel for the respondent requested that the answer of the witness as to prior custom be stricken out. The court refused to do so. To that refusal and to a reiteration and elaboration of the same subject-matter by the witness exceptions were allowed. Counsel also took an exception to the refusal of the court to strike out the answer of the witness to the effect that the incident of Mr. and Mrs. Brown riding separately was fixed in his mind as happening on March 6th by reason of the fact that it was brought to his attention that on that night "something had happened out of the ordinary."

Neither exception has merit.

We will concede without deciding that under certain conditions custom may not be admissible to prove the doing of a certain act. But the custom of Mr. and Mrs. Brown to come in together was not introduced in evidence for that purpose here. In this instance their prior custom was relevant because the failure to conform to it fixed the circumstance on the mind of the witness that on a certain night they did not ride in his elevator at the same time. There was no error in the ruling of the court admitting such evidence.

Neither was the court in error in refusing to strike out that part of the answer to the succeeding question by which the witness explained that he was able to fix the date of this occurrence as March 6th because something out of the ordinary happened that night. The rule is well settled in this state and elsewhere that evidence admissible on one ground, and offered in good faith for a legitimate purpose such as refreshing the recollection of a witness, or as showing why he was able to fix a certain date as the time when an occurrence took place, is not to be excluded from the consideration of a jury because it may be irrelevant or inadmissible on other grounds or otherwise prejudicial. *State* v. *Farmer*, 84 Me., 436, 24 A., 985; *Plourd* v. *Jarvis*, 99 Me., 161,

58 A., 774; *O'Brien* v. *J. G. White & Co.*, 105 Me., 308, 74 A., 721; *Johnson* v. *Bangor Railway & Electric Co.*, 125 Me., 88, 131 A., 1; *State* v. *Mosley*, 133 Me., 168, 175 A., 307; *Angell* v. *Rosenbury*, 12 Mich., 241; *State* v. *Fox*, 25 N. J. L., 566; *Bingham Mines Co.* v. *Bianco*, 246 Fed., 936; Wigmore on Evidence, 3 ed., Vol. I, Sec. 13; Vol. II, Sec. 655. The rule is well stated by Chief Justice Peters in *State* v. *Farmer*, supra, at page 440, 24 A., at page 986, as follows:

"That evidence, properly admissible for one purpose may be so perverted in its use as to effect a different and illegitimate purpose, is not altogether preventable. But such evidence cannot on that account be wholly rejected. The correction of its abuse lies in such explanation as the presiding judge may feel required to give to the jury concerning it."

In the case now before us the presiding justice even without any request by respondent's counsel was scrupulously careful to explain to the jury the ground on which the evidence was admitted and to warn them that they must consider it for no other purpose. He said, in admitting the evidence: "This testimony is admitted not as testimony of, as evidence, that something did happen, but merely as evidence that tends to fix the date in his mind." Again in his charge he reiterated the same warning.

In the trial of this case the rights of the respondent were at all times scrupulously guarded. We find no error in the conduct of the trial.

*Appeal dismissed.*
*Exceptions overruled.*
*Judgment for the State.*