STATE of Maine

v.

Gregory GAGNE.

Supreme Judicial Court of Maine.

Aug. 11, 1975.

Donald H. Marden, County Atty., Joseph M. Jabar, Dist. Atty., Augusta, for plaintiff.

Alan C. Sherman, Waterville, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

WEATHERBEE, Justice.

In March of 1974 a Kennebec County jury found the defendant guilty of robbery while armed with a firearm[1] and of assault while armed with a firearm.[2] The two offenses were tried together and the victims alleged were a son and father, respectively. On appeal, the defendant claims prejudicial error involving the testimony of two of the State's witnesses, a Mr. Barber and a Miss Grant, each of whom testified that the defendant had described to them his direct participation in the crimes. We deny the appeals.

Apart from the testimony of Mr. Barber and Miss Grant, there was evidence from which the jury could have found as follows:

In the early evening of December 7, 1973, Timothy Cote, a 16-year-old boy, was collecting rental money from his father's tenants on Autumn Street in Gardiner. As he stepped out of one particular building into the darkness he had in one hand four copies of receipts he had given and in the other a bank bag containing some $700.00 in money. He was suddenly confronted by a man whose face was covered by a nylon stocking and who displayed a handgun and demanded the money. The boy surrendered the money bag and also handed the robber the receipts. The robber ordered the boy to crawl under the boy's pickup truck. As the boy was complying two things happened. The robber abruptly peeled off the nylon stocking, the friction causing his somewhat light hair, which was "fairly long", to "stand out straight". Another vehicle which the boy recognized as that of his father drove into the yard. The robber turned and ran out to the street and then north down the side of the street. Mr. Cote backed his car into the street and pursued the robber, losing him at the corner of Autumn and Spring Streets. Then, seeing a car parked on Spring Street, he drove up beside it. He observed this to be a red car with a black top, a two-door sedan or coupe, and saw that a man with "very bleached bushy hair" sat behind the wheel. Mr. Cote left his car and had started towards this person when another man appeared, standing on the opposite side of the red and black car, aiming a handgun at Mr. Cote over the top of the car. This person told Mr. Cote, profanely, to leave the scene and as Mr. Cote got back into his car he heard two gun shots and the sound of two bullets striking his vehicle. As he drove away, he saw the robber's car turn and disappear up Spring Street.

In the meantime, an observant lady living on Spring Street had looked out of her window toward the corner of Autumn and Spring Streets. She saw a young man running fast down Autumn Street with his hair "sticking all up straight from his head." As he turned the corner he nearly ran into a tree. Mr. Cote's vehicle appeared in view only seconds behind him. Seconds later, she heard two gunshots and she saw Mr. Cote's vehicle driving away and a red and black car was turning around and then drove off in the other direction past her house. This lady had made a hobby of identification of makes and models of automobiles and she believed this car to be a Ford manufactured in "the late 60's".

A police officer who arrived soon at the scene found the four rent receipts lying in Autumn Street in front of the house from which the lady had made her observations.

There was admitted into evidence a certified copy of the 1973 registration of a

1. 17 M.R.S.A. § 3401–A.

2. 17 M.R.S.A. § 201–A.

1969 Ford Torino red and black two-door convertible in the name of Gregory Gagne.

Neither Mr. Cote nor his son identified the defendant as the robber, whom each had seen only momentarily in the darkness. The boy admitted that his impression was that the robber was older and larger (200 pounds) than the defendant appeared to be at the trial. He explained, ". . . [B]ut I was scared. I just looked at that gun a lot." Mr. Cote had seen the man briefly in the lights of his car while he was running down the street and again briefly at the red and black car. His impression was that the robber was much smaller (140 to 145 pounds) than his son had described him and that his hair was dark. The record does not show the defendant's height or weight or the color of his hair.

It is safe to say that the jury could not properly have found the defendant guilty of either offense but for the testimony of either Mr. Barber or Miss Grant. Because of the crucial nature of their testimony, we must analyze with particular care its significance and the manner in which the portions now in question came to be presented to the jury.

*Defendant's Contention That the State Was Permitted to "Bolster" the Credibility of its Witness Barber*

The jury could find that:

The robbery took place at about 5:30 p. m., December 7, 1973. Shortly after this, Mr. Barber was convicted of an unrelated felony and was confined to jail as a result of his inability to furnish bail. About four or five days later, he was admitted to bail but on December 26 his bondsmen returned him to the Sheriff. Soon after this, the police came to the jail and asked him if he had any information concerning the Cote robbery. Mr. Barber told them that the defendant had told him of his commission of the crime and that he, Barber, would testify to what he knew about it if the police would assist him in getting his bail reduced.

The police indicated a willingness to cooperate but nothing came from this proposal as on December 31 Mr. Barber was able to furnish bail in the original amount. On January 2, Mr. Barber was arrested on another charge in Piscataquis County and was being held in jail there on January 18 when Augusta Police took him from the jail temporarily to bring him to Augusta for a polygraph test concerning another, unrelated crime. Following this, Mr. Barber was taken to the Augusta Police Department where he made and signed a statement in which he said that within an hour or an hour and a half after the Cote robbery he met the defendant and one Wheelock in the Colonial Restaurant and that the defendant told him, in some detail (which Barber related), that he and Wheelock had just committed the Cote robbery. The police, in return, with the County Attorney participating, agreed to help him get reduced bail in Piscataquis County and he was released there on January 21. On January 29 he was back in jail on another charge. He frankly admitted that his motive for aiding the police was to get out of jail.

■ At trial, Mr. Barber testified at length concerning his conversation with the defendant and then the County Attorney proceeded to inquire concerning the agreement Mr. Barber and the law enforcement officers had made that Mr. Barber would testify in consideration for the State's help concerning bail. At this point, the defendant's counsel objected, contending that

"He is bolstering his witness by showing this is all above board, and in an effort to steal the thunder from the defense, which is prejudicial. This testimony was educed as a result of promises made, which I would guess is what he is trying to get into."

Defense counsel's frank statement was matched in candor by the County Attorney's statement:

"No. No, I am trying to disclose fully that this man has an agreement with the County Attorney's office for his testimony, and charges were brought against him, and questions of bail were determined in his favor at the time that he made this written statement."

The presiding Justice permitted the testimony concerning the agreement to be given to the jury. There was no error.

The circumstances under which the witness was giving this testimony were relevant to the witness's credibility and were matters proper for the jury's consideration. The defendant's objection is, in essence, that he was not permitted to be the first to disclose it.

The disclosure by either party could be expected to effect some reduction of the witness's credibility. If the State had not been permitted to disclose the circumstances of the witness's willingness to testify and if the defense revealed it on cross-examination, the jury would very likely have also received the impression that the State had tried to deceive the jury by concealing the self-serving nature of the informant's motivation. Such an impression would have been contrary to the actual situation and a hindrance to an informed and reasoned evaluation of the testimony by the jury. The effect of the Justice's ruling was not to permit the State to "bolster" the credibility of the witness but to place in their true light the circumstances under which Mr. Barber's testimony was offered by the State. The Justice did not abuse his discretion in admitting it.

*The Witness's Reference to Another Crime*

 In the course of divulging through Mr. Barber the agreement the law enforcement officers had made with Mr. Barber, the County Attorney asked the witness what he recalled about a discussion between the witness and the law enforcement officers in the Waterville Police Station concerning the consideration the County Attorney's office would give Mr. Barber in exchange for a statement from him relating to the Cote robbery, and the witness answered:

"There was a discussion on Larrabee's Fish Market."

Defense counsel immediately moved for a mistrial, asserting to the Justice at side bar that there had been a robbery of Larrabee's Fish Market less than three months before and that the defendant was under indictment for that crime also. The Justice denied the motion stating that he felt no prejudice had resulted to the defendant, that he, himself, had been unaware that the defendant had been one of those charged with participation in it and that he had drawn no such conclusion from the witness's statement. We agree with the Justice's evaluation of the effect of the witness's answer. If any jurors knew before this incident that the defendant was charged with the Larrabee robbery, the witness's remark added nothing to their knowledge. If they, like the Justice, did not know this, it seems to us that the answer would have conveyed to them the impression that the police were referring to *Mr. Barber's* possible participation in it.

We see no abuse of discretion in the denial of the defendant's motion for mistrial.

*The Reference to the Polygraph Test*

Defense counsel cross-examined Mr. Barber very exhaustively concerning the circumstances under which Mr. Barber had given the Augusta police a written statement relative to the defendant's account admitting the Cote robbery, with particular emphasis on the visit which two Augusta detectives paid Mr. Barber while he was being held in jail in Dover-Foxcroft. Defense counsel referred to this visit:

"Q Alright, and what was said with reference to your getting out of jail

or anything else? Were you promised anything then in return for your testimony?

A No, I was asked to take a polygraph.

Q With reference to something else?

A Yes.

. . . . . .

A The Augusta Police Department came up to Piscataquis County Jail to get me to go, to come down to Augusta Police Headquarters to take a polygraph. It was on Saturday. I come down and took the polygraph, and they took me to the Augusta Police Department and that is where I signed the statement. That is the night I signed the statement."

After some reference to Mr. Barber's Piscataquis County case and his later arrest on still another charge, defense counsel turned again to the execution of the statement:

"Q And you signed it. You said it was true and accurate to the best of your knowledge and recollection, is that right?

A The best I can remember, yes.

Q What do you mean, best you can remember?

A That is what the statement says.

Q It is true or untrue?

A Yes, it is true. I mean I had three or four beers. There might be a few words I left out.

Q You are telling me you were under the influence of intoxicating liquor on the day you made this statement?

A Yes, sir.

Q So this statement might be incorrect.

A There may be a few words that is incorrect, but nothing drastic.

. . . . . .

Q What influence had your drinking had on you that day, if any?

A Not that much.

Q Three or four beers didn't influence you?

A No."

The County Attorney, on re-direct, took up the question of the witness's sobriety at the time the statement was made:

"Q Okay. And when you said that you had had two or three drinks or three or four beers or whatever it was, do I understand that to mean at the time you made the statement or at the time you heard this conversation at the Colonial?

A At the time I heard the conversation at the Colonial.

Q Alright. Your testimony was, was it not, that you went and took a polygraph test and then came down and made the statement?

A Yes, sir.

Q And you had come from Franklin County jail?

A Yes, sir.

Q So you hadn't had anything to drink on that day?

A No, sir."

On re-cross, defense counsel made clear that the poloygraph test did not relate to the present matter:

"Q As I understand it, the polygraph which has been referred to by the County Attorney related to another matter, did it not?

A Yes, sir."

■ Thus we see that the reference to the polygraph test did not result from a direct question from either state or defense counsel and apparently entered the testimony innocently. The County Attorney's reintroduction of the subject was perhaps ill-advised but it was apparently intended to rebut the impression that the witness may have been influenced by liquor at the time he made the statement to the police— that is, to make clear that he came directly from jail to the scene of the polygraph test, took the test and then went from there to the police department where he made the statement, very likely sober.

Defense counsel made certain that the jury understood that the polygraph test concerned an unrelated matter. He made no motion to strike, for a mistrial, or for a curative instruction. He elected to continue with the trial, doubtless finding some comfort in the addditional evidence that the often-arrested State's witness was apparently involved in still another matter of police interest.

The presiding Justice did not intercede in the matter and, scrutinizing the record for manifest injustice, as we must do under M.R.Crim.P., Rule 52(b), we find none. *State v. McKeough,* Me., 300 A.2d 755 (1973). The only possibility of prejudice to the defendant would seem to be that of the jury's concluding that the results of the polygraph test must have supported Mr. Barber's veracity as to the unrelated matter or otherwise the police would not have accepted a statement from him on *this* matter and that, therefore, his reliability having been supported as to the other matter, his testimony becomes significantly more acceptable as to this matter. The possibility of this effect transpiring seems very remote to us. Although this Court has held that the results of polygraph tests and a party's willingness or unwillingness to take such a test are inadmissible (*State v. Casale,* 150 Me. 310, 110 A. 2d 588 (1954)), we are unconvinced that the reference to the polygraph test tended to produce manifest injustice under these circumstances.

### The Reference to the Sexual Assault upon Miss Grant

Miss Grant's testimony disclosed that the defendant had participated in an uncompleted sexual assault upon her and the disclosure of this incident before the jury formed the basis of a motion for mistrial by the defendant which the presiding Justice denied.

We must evaluate this exercise of the Justice's discretion in the light of a careful examination of the circumstances under which the incident was revealed.

Miss Grant, a 20-year-old woman, was called as a witness for the State. She testified that shortly before Christmas she had gone to the apartment of an absent friend over the Colonial Restaurant and found the defendant there. She had known the defendant for several months and her gentleman friend had acted as bondsman for Mr. Barber on several occasions. The defendant inquired if Miss Grant had any information as to the extent of official knowledge concerning the Cote robbery. He then told her that he had been the robber and he described the operation in some detail. She testified that at this point four other men entered the apartment.

On January 21, Miss Grant had been questioned by the police and had given them a written statement in which she related the defendant's admission to her.

On cross-examination, Miss Grant admitted that this statement was inconsistent with her trial testimony in two respects— first, in her written statement to the police she had said that two of these men were present with the defendant *when she arrived* (and therefore presumably would have overheard her conversation with the defendant) and, secondly, in her written statement to the police she had not mentioned the presence of the *other* two at all.

## 193

Defense counsel pressed the witness concerning this inconsistency and she explained it by saying:

"Well, I was just nervous and upset the day I made the statement, and that day I had to change two or three things around in the statement, and evidently I just—"

Defense counsel continued to question Miss Grant as to the reason for these inconsistencies and this time she replied:

"Well, I had talked to three or four different people that day, and I had to bring up something which was a discomfort to me, and it did work me up."

Still, defense counsel persisted:

"Q And it confused you?

A Well, yes, it did.

Q Had you made this fact known to Mr. Welch?

A Yes. He also knew I was very nervous and upset.

Q And the reason that you were?

A Yes."

Finally, in answer to a leading question on cross-exaination, the witness made the disclosure which she had been avoiding:

"Q And the reason that you were nervous and upset was because one of these gentlemen had made some sexual advances on you, is that right?

A Well, more than one.

Q More than one?

A Yes.

Q And that was the reason why you were confused as to who was there?

A I was very upset.

Q And you made this fact known to Mr. Welch?

A Yes.

Q Capt. Welch.

A Yes. Everyone who had talked to me that day knew I was very nervous and upset."

It is obvious that defense counsel's deliberate invasion into this dangerous area was the acceptance of a calculated risk. Counsel no doubt recognized that Miss Grant's testimony, if found credible by the jury, would result in the defendant's conviction and that a serious risk must be taken in an effort to shake her story. That he was aware of the seriousness of the risk is demonstrated by the fact that the record discloses that Miss Grant had testified to the sordid details of the incident in District Court. Counsel made a tactical decision to belittle Miss Grant's claim that the errors in her statement to the police resulted from the disturbing nature of the incident.[3]

The County Attorney then took over the witness in re-direct. He refrained from making any reference to the assault in the apartment.

The State then called a police officer who testified (among other things) that he took the statement from Miss Grant at the County Attorney's office. The State again avoided any reference to Miss Grant's being "nervous" or "upset" or as to the possible cause of her "confusion". The State rested.

The defense then presented a Mr. Sounier, one of the men who Miss Grant had testified had entered the apartment following her conversation with the defendant. Mr. Sounier said Miss Grant and the four men had all entered the apartment together and that there had been no conversation between Miss Grant and the defendant rela-

3. Our analysis of the rationale for his interrogation should not be construed as criticism of his choice of strategy in a most difficult situation.

**194**

tive to the robbery. He described what the defense attorney had originally referred to as "some sexual advances" in this manner:

"And Greg was sitting next to me, and Eddie was sitting over in the other chair. Greg was drinking quite a bit. We were all sitting there. Bob [surname omitted] was wrestling with Penny on this cot. We were sitting on the couch, and as far as I know there was nothing said between Greg and Penny because thoughout he had been drinking quite heavily, and they were wrestling back and forth. I guess Bob got too rough with her, and finally we all went back down to the Colonial."

On cross-examination of Mr. Sounier the County Attorney made his first reference to the matter and the witness was inclined to minimize the importance of the incident:

"A . . . Bob, like I say, was wrestling with Penny.

Q What do you mean, wrestling?

A He was wrestling on the cot.

Q What do you mean?

A Well, I don't know—wrestling.

Q Was she wrestling with him? Was this just a horsing around type of thing?

A Yes.

Q Did she express any objection at any time?

A Well, somewhat.

Q What do you mean, somewhat?

A She said, Bob, leave me alone, Bob, cut it out, and finally I told Bob to take it easy, let's go, let's go back down to the Colonial. Things were getting too rough.

Q Things were getting a little too rough?

A Yes. They were drinking and Bob was horsing around with her.

· · · · · ·

Q Everybody else was just sitting around drinking beer?

A Yeah."

When the defense rested, the State called Miss Grant in rebuttal. She repeated her testimony that the others had entered *after* her conversation with the defendant. She then, for the first time, briefly described the incident, the recounting of which to the two policemen she had said had upset her so as to cause the errors in her statement. In substance, she said that one of the new arrivals had attempted to rape her, with the defendant's assistance, and that, failing that because of her resistance, they attempted to have oral sex with her but when the defendant seized her throat to force her to comply, Sounier

". . . said to stop it, and he grabbed Bobby off me and he took me in the bathroom and tried to calm me down, and I just begged him to get those guys out of there, and so they left and I stayed up there and, of course, I was very upset and I was crying and stuff, and then they went back down stairs and I calmed down there for a few minutes, and then I got in my car and left."

Defense counsel made no objection to this testimony, no doubt accepting the fact that the defense had introduced the subject into the trial. After consulting with his attorneys at recess, however, the defendant personally addressed the Court in the jury's absence and moved for a mistrial. The Justice denied the motion.

The defense then called in sur-rebuttal the father and mother of the defendant each of whom testified that at the probable cause hearing Miss Grant had testified

about the sexual assault but had said that the defendant had had nothing to do with it. The State then called a police officer who rebutted this, saying that Miss Grant had testified at the probable cause hearing that the defendant had attempted to have oral sex with her.

The testimony closed. The defendant did not testify.

The introduction of this testimony concerning the assault on Miss Grant had disturbed the Justice—as it disturbs us—and after the noon recess he returned to the subject in the jury's absence. He told counsel and the defendant that he had given the defendant's motion for mistrial further consideration during the noon recess and had weighed the fact that the testimony was relevant and material and that the subject was introduced by the defense against the danger that it might inflame the jury against the defendant. He said he had concluded that it was his duty to permit the case to go to the jury with cautionary instructions. He particularly invited suggestions for special cautionary instructions.

The instruction he gave to the jury concerning the limited use which the jury might make of this testimony and the terrible consequences of their making any other use of it was long, thorough and understandable. He stressed the sensitive area in which the testimony fell, its very limited admissibility and its potential for prejudice. He made it clear that the jurors could consider whatever they found the true facts of the incident to be only as bearing on Miss Grant's credibility and not as evidence of bad character of the defendant. He bluntly told the jurors that

"the integrity of all twelve of you is really on the line to follow the law,"

as to their use of this evidence. There were no objections or requests for addi-

tional instructions. We are convinced that his unusually forceful instruction must have deeply impressed the jury.

Our careful analysis of the record brings us to the conclusion that there was no abuse of judicial discretion.

The admitted inconsistencies between Miss Grant's testimony and her earlier statement to the police offered the defense a significant opportunity to attack her credibility. The defense made a deliberate —and no doubt desperate—gamble in attemping to belittle her explanation for the inconsistencies by suggesting that the incident which she said disturbed her recollection was in fact of a somewhat trivial nature.

We note that both the witness and the County Attorney exercised commendable restraint in avoiding a disclosure of this unpleasant incident until the issue had been raised by the defense several times and until the question of whether Miss Grant had been so perturbed and distressed on recalling the incident and describing it to the two officers that she confused the time of the arrival of the man had become crucial to the acceptability of her testimony.

While we do not criticize the defense tactics, we feel that the State became entitled to rebut the defense suggestion and to do so by presenting a not unnecessarily emotional explanation of the incident which the defense deliberately chose to bring to the jury's attention. *State v. Hudson,* Me., 325 A.2d 56, 64 (1974).

Relevant evidence is not required to be excluded merely because it suggests a defendant's involvement in another crime. On the other hand, it may be excluded if it is too prejudicial in contrast to its probative value. *State v. Northup,* Me., 318 A. 2d 489, 493 (1974). Miss Grant's testimony as to the assault was not only relevant but also material. *Towle v. Aube,* Me., 310

A.2d 259, 265 (1973). The presiding Justice, who sees and hears the drama of the trial unfold before his unprejudiced observation, is allowed wide discretion in balancing the competing interests. *State v. Northrup, supra* at 492–494. Certainly the factors which he must consider include the responsibility for the introduction of the subject matter into evidence (*See State v. Lizotte,* Me., 249 A.2d 874, 880 (1969); *State v. Gervais,* Me., 317 A.2d 796, 800 (1974)), the materiality of the testimony to the determination of the issue of guilt or innocence and its potential for prejudice under the circumstances.

█ The fact that the defense "opened the door" to examination of the adequacy of the cause of Miss Grant's inconsistencies does not per se entitle the State to explain it by presenting *any* relevant and material evidence. It presents a factor the weight to be given which must lie in the discretion of the presiding Justice.

We faced this basic problem in *State v. Brown,* 142 Me. 106, 115, 48 A.2d 242, 246 (1946) where we accepted the analysis of Chief Justice Peters in *State v. Farmer,* 84 Me. 436, 440, 24 A. 985, 986 (1892):

"That evidence properly admissible for one purpose may be so perverted in its use as to effect a different and illegitimate purpose is not altogether preventable. But such evidence cannot on that account be wholly rejected. The correction of its abuse lies in such explanation as the presiding judge may feel required to give to the jury concerning it."

We cannot say that the presiding Justice's denial of the motion for mistrial was an abuse of discretion under these circumstances.

The entry will be:

Appeals denied.

All Justices concurring.