STATE of Maine

v.

Richard A. McEACHERN.

Supreme Judicial Court of Maine.

Argued Nov. 3, 1980.

Decided June 25, 1981.

Charles K. Leadbetter, Michael E. Saucier, Asst. Attys. Gen., Augusta, for plaintiff.

Gross, Minsky, Mogul & Singal, George Z. Singal, Bangor, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY and GLASSMAN, JJ., and DUFRESNE, A. R. J.

PER CURIAM *.

Following a jury trial in the Superior Court, Penobscot County, Richard McEachern was convicted of murder pursuant to 17–A M.R.S.A. § 201(1)(A). On this appeal, defendant contends that numerous errors occurred during the course of his trial including errors in evidentiary rulings, in jury instructions, in denial of a mistrial for allegedly improper argument by the prosecutor, and in denial of a motion for judgment of acquittal. We affirm the judgment.

From the evidence at trial, the jury would have been warranted in finding the following facts. The victim of the homicide, George Fredericks, was shot at about 7:00 p. m. on November 2, 1978, while sitting in an armchair in the living room of his Brewer motel apartment. His girl friend, who at the time was in the apartment kitchen, heard a volley of shots and the sound of breaking glass but did not see the assailant. Never regaining consciousness, Fredericks died the same evening from a bullet wound in his skull. Trial evidence established that Frederick's death was caused by a .22 semiautomatic rifle owned

---

* The opinion in this case was written by Glassman, J., and adopted by the court after his death.

by defendant. The rifle had been fired through the living room window from the darkness outside, the bullets having pierced translucent drapes. Nearly two weeks later, the authorities found the rifle buried in green plastic garbage bags by a snowmobile trail near the victim's home.

Fredericks and defendant McEachern were acquaintances of long standing whose relationship had been mutually hostile for a couple of years before the homicide. Fredericks had at one point lived with defendant's wife or then ex-wife. Defendant also owed $300 to Fredericks, who made unsuccessful but repeated attempts to collect the debt. In the course of their hostility, defendant made at least two threats against the victim's life. One occurred about a year and a half before the killing and a second somewhat closer to a year before.

On the morning of November 2, 1978, according to his girl friend, defendant left to go hunting with David Ward. Ward testified that defendant McEachern came to his home that morning around 10:00 a. m. carrying a rifle and some green garbage bags. Instead of hunting, however, the two got into one of Ward's family cars, did an errand for Ward's mother, exchanged cars, visited a friend and spent the remainder of the afternoon driving around drinking and talking. The rifle remained in the back seat of the automobile. Between 1:30 and 6:30 p. m., the pair consumed up to a fifth of brandy and a pint of vodka and smoked as many as eight marijuana joints. While driving, the two of them twice passed the Wee Holme Motel where Fredericks lived. On both occasions defendant told Ward that he wanted to "confront [Fredericks], to settle their differences." On each occasion Ward refused to stop, concluding that it was not "very wise at the time." At the day's end, the pair drove back to the friend's house where they had earlier visited. Staying there only 20 minutes, they left around 6:30 p. m. For a third time defendant asked to be dropped off by the Wee Holme Motel. This time Ward acceded to the request, and defendant left the car with his rifle in hand. Ward drove on, parked, and shortly thereafter passed out from intoxication.

Ward further testified that the day after the shooting defendant McEachern called him to ask that he tell the police that McEachern had been dropped off not in front of the Wee Holme Motel but at the end of the Bangor-Brewer bridge. Ward did give that false story to the police. Two days after the shooting, in response to Ward's direct question, defendant told him

that after I'd dropped him off he had crossed across the road and gone behind the Wee Holme Motel and looked in one window, it was the wrong window; gone to another window, looked in. He said he backed off, took five or six shots, heard a scream, then he said he ran . . . .

. . . .

[He] said when he went around the Ken Taylor's Antiques he'd almost run into the back of a police car. He said he proceeded up and he had crossed—as I remember he said he crossed up by the road—came up by the road and crossed around the stream and then gone by the snowmobile trail up to my house and he buried the gun in the garbage bags on the snowmobile trail.

Subsequently, Ward recanted his first story to the police and told them substantially what is quoted above. The police thereafter discovered the buried rifle. There was other inculpatory evidence in the record: First, the State showed, in confirmation of Ward's testimony, that there was in fact a police car parked near Ken Taylor's Antiques at about the time that defendant told Ward he had almost run into one. Second, when defendant returned home at about 9:00 or 9:30 p. m. on November 2, he immediately told his girl friend, Laurie Hathaway, that he had sold his rifle. Third, when his girl friend soon after heard from a newscast that Fredericks had been shot, her immediate reaction was to ask defendant whether he had shot Fredericks. McEachern, who did not seem drunk, responded that he had not, but added that he felt "a thousand pounds lighter on each shoulder." Fourth, after his arrest, defendant asked

his girl friend to try to get David Ward to leave the state, and from jail he wrote Ward a letter threatening his life.

Defendant did not take the witness stand. In his defense, Christopher McCann testified that between 7:30 and about 8:15 on the evening of the killing he and defendant were sitting in the Gaslight Bar several miles from the Wee Holme Motel. During cross-examination, it appeared that McCann was uncertain whether he was with defendant on the evening of the killing or on some other evening during the same week. Furthermore, McCann confirmed that defendant had called him several weeks after the crime to ask him to testify that their encounter at the Gaslight Bar did, in fact, take place on November 2 and not on some other date.

### I. Sufficiency of the Evidence

■ Having adequately preserved the issue for appellate review, defendant now asserts that the evidence was insufficient to support his conviction of the offense of murder. "In reviewing the sufficiency of the evidence, we apply the standard that the conviction must be set aside if 'no rational trier of fact could [find] proof of guilt beyond a reasonable doubt.'" *State v. Lagasse*, Me., 410 A.2d 537, 542 (1980), *quoting Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979).

Defendant does not contend that the evidence is insufficient to permit a finding that he was the individual who fired the shots that caused the victim's death. Rather, he contends that the evidence is insufficient to establish that he acted intentionally, *i. e.*, with a "conscious object to cause" Fredericks' death, or knowingly, *i. e.*, with an "aware[ness] that it is practically certain that his conduct will cause such a result." *See* 17–A M.R.S.A. §§ 10(1)(A), 10(2)(A) (Supp.1980). Defendant asserts that the evidence is sufficient to establish only that he acted recklessly or with criminal negligence, thereby justifying conviction only for manslaughter.

Defendant's argument is predicated solely upon an absence of direct evidence of his state of mind at the moment of firing the fatal shots. There is rarely, if ever, direct evidence of a defendant's mental state at the time of commission of an unlawful homicide. Of necessity, the mental state must be proven by circumstantial evidence. *See, e. g., State v. Grindle*, Me., 413 A.2d 945, 949 (1980); *People v. Reed*, 23 Ill. App.3d 686, 320 N.E. 249 (1974). Here, the circumstances surrounding Fredericks' killing, including the long period of hostility between the parties, defendant's threats against the victim, and his expressed desire to "confront" him, all were sufficient to permit the jury to conclude beyond a reasonable doubt that defendant acted with the requisite mental state.

### II. Evidentiary Rulings

#### A.

■ William Gaudette, president of a local motorcycle club, testified that about five or six months before the killing he had "heard" that Fredericks and two others from his motorcycle club had gone to defendant's home and started a fight. He had also heard of ongoing mutual hostility between Fredericks and McEachern and had taken it upon himself to intervene. Gaudette stated that he went to defendant, whom he had not previously known, and proposed to set up, as well as supervise, a fair and weaponless fight between the two antagonists for the purpose, apparently, of ending their differences once and for all. Defendant rejected the proposal, stating to Gaudette that if Fredericks "ever came around him again, he'd blow his head off."

Defendant concedes that the trial court correctly admitted the threat itself. *See State v. Gagne*, Me., 362 A.2d 166, 169–70 (1976). Gaudette's testimony was first presented to the presiding justice outside the hearing of the jury in order that he might rule on its admissibility. Defendant objected to Gaudette's testimony concerning what he had "heard" concerning the hostility between the victim and defendant upon the ground that that testimony would be hearsay. The presiding justice ruled that he would admit the statements not for the truth of the matter asserted to Gaudette, but merely as explaining the circum-

stances under which Gaudette had undertaken to have discussions with defendant. When the testimony was presented before the jury, the justice made the same ruling and immediately instructed the jury as to the limited purpose for which the Gaudette testimony was received. He repeated the instruction in his final charge to the jury at the conclusion of all the evidence.

Hearsay is defined by M.R.Evid. 801(c) as follows:

> [A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

The presiding justice eliminated any hearsay problem by properly limiting the purpose for which the evidence was admitted. The statements made to Gaudette were relevant not for the truth of the matter asserted to Gaudette, but merely as showing the circumstances that caused Gaudette to undertake to arrange a confrontation between Fredericks and McEachern leading to the threat made by the latter. To make sure that the jury would consider the evidence only for the limited purpose for which it was received, the justice carefully instructed the jury at the time the evidence was admitted and again in his final charge. The admission of Gaudette's testimony was not error. *See State v. Brown*, 142 Me. 106, 48 A.2d 242 (1946).

### B.

■ Katherine von Soosten, an acquaintance of both McEachern and Fredericks, testified that defendant had threatened Frederick's life about a year and a half before the killing. At that time, von Soosten had overheard Fredericks trying to arrange to collect money owed to him by McEachern. According to von Soosten, McEachern's response was abrupt and angry:

> Rick said that he was getting sick of being afraid to leave his house and not being able to go around town without being in fear of being beaten up by George or one of George's friends. He told him he knew he couldn't beat him in

a fist fight. He said, someday when you least expect it I'm going to kill you. And he took off running down the street.

Defendant objected to the admissibility of this testimony, contending that the threat was too remote and, as such, unfairly prejudicial. Holding that the remoteness of the threat went to its weight, not to its admissibility, the presiding justice overruled defendant's objection. The justice correctly evaluated the proffered testimony under M.R.Evid. 403, which authorizes the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have previously noted that

> [t]he weight of evidence of antecedent threats may well depend on the length of time between the threat and the act, remoteness in time not affecting competency . . . .

*State v. Doyon*, Me., 221 A.2d 827, 829 (1966), and cases therein cited. There was no error in the admission of von Soosten's testimony.

### C.

■ Over defense counsel's objection the trial court admitted in evidence a letter written from jail by defendant to David Ward. Defense counsel objected upon the ground that the letter was not relevant and that it was unduly prejudicial. The justice rejected both asserted grounds for exclusion. In addition to threats against the witness Ward, the letter expressed McEachern's expectation that he would be convicted and spend a substantial period of time in jail.

In general, threats against witnesses, like the destruction of evidence, are properly received in evidence on the theory that such activity constitutes admission by conduct. *See* C. McCormick, *Handbook of the Law of Evidence*, 660 (2d ed. 1972). Although we have never had occasion to rule on the admissibility of threats against potential witnesses made after commission of a

crime, other jurisdictions have found such threats to be admissible. *E. g., United States v. Pinto*, 394 F.2d 470 (3d Cir. 1968); *People v. Chin Hane*, 108 Cal. 597, 41 P. 697 (1895); *Commonwealth v. McCauley*, 355 Mass. 554, 246 N.E.2d 425 (1969). Unquestionably, some prejudice may result to a defendant from the admission of evidence that he has made threats against the state's witnesses. The probative value of such evidence arises from the inference that an innocent person would not undertake to intimidate witnesses and that such intimidation is therefore an admission by the defendant of his guilt.

The problem posed by the proffer of such evidence is one of balancing its probative value against its prejudicial effect as mandated by M.R.Evid. 403. Here, the record is clear that the presiding justice undertook to evaluate the evidence under the criteria mandated by the rule. "[T]he balancing of probative value against prejudicial effect rests within the sound judicial discretion of the presiding Justice." *State v. Lagasse, supra* at 541. We find no abuse of discretion.

### D.

■ Defendant sought to present the testimony of Wayne Gray, a mutual acquaintance of both himself and the victim. In an offer of proof outside the presence of the jury, Gray testified that in January of 1977, some 22 months before the killing, he was "involved in" firing four rounds from a .22 semiautomatic rifle into the home of McEachern. Three of the bullets went through the window. According to Gray, the act was done only to scare McEachern. The presiding justice excluded the evidence upon the ground that it was not relevant.

On appeal defendant urges that the evidence was relevant because from Gray's testimony that in firing into McEachern's house he only intended to scare him the jury could infer that 22 months later when McEachern fired into Fredericks' home McEachern also intended only to scare Fredericks. How Gray's state of mind on one occasion could have any bearing upon defendant's state of mind at the time of the commission of the unlawful act here involved is left unexplained. There is no logical relationship between Gray's state of mind when he committed an unlawful act and defendant's state of mind when he committed the unlawful act for which he was being tried. The presiding justice was correct. The evidence was not relevant; it had no tendency to make the existence of a material fact more or less probable. *See* M.R.Evid. 401.

### E.

■ As noted earlier in this opinion, alibi witness Christopher McCann, called by defendant, testified on direct that at about the time Fredericks was shot defendant and McCann were in the Gaslight Bar several miles from the scene of the crime. On cross-examination he revealed that he had told Detective Shuman that defendant had called him from jail to suggest and to confirm that the night on which they had been drinking was November 2. McCann also told the detective that he himself was unsure of the calendar date. When asked whether he did not remember telling Shuman that it could have been a Friday instead of a Thursday night upon which he had been drinking with McEachern, McCann replied, "No, I don't."

On redirect examination, defense counsel brought out that McCann's confusion about time was related only to the calendar date. McCann maintained that he and McEachern had been together on the night that Fredericks was killed. Recross by the State elicited only that McCann was "almost sure" as opposed to absolutely positive that the night in question was a Thursday.

After McCann was excused, the State exercised the right it had reserved to recall Detective Shuman in rebuttal. Shuman testified that during their interview McCann had told him that it might have been a Friday evening when he and defendant were together. Defendant then sought to recall McCann for surrebuttal. The presiding justice listened to McCann's proposed surrebuttal testimony outside the presence

of the jury and excluded it upon the ground that it was merely cumulative and added nothing. We agree with the justice. McCann's surrebuttal testimony would not have contradicted the rebuttal testimony of Detective Shuman. It was merely a reiteration of the testimony McCann gave when he was first on the witness stand, that he had expressed no doubt to Detective Shuman that he had been with defendant on the night Fredericks was killed. It is not an abuse of discretion to exclude proposed surrebuttal testimony that is merely cumulative.

## III. Allegedly Improper Prosecutorial Comment

■ Defendant moved for a mistrial asserting that the State during its final argument had improperly commented upon defendant's failure to testify.[1] In *State v. Tibbetts*, Me., 299 A.2d 883, 886–91 (1973), we announced rules whereby we would determine whether comment by a prosecutor on a defendant's failure to testify was reversible error. Those rules were reaffirmed in *State v. Libby*, Me., 410 A.2d 562 (1979). The *Tibbetts* rules have absolutely no application unless there is first a determination that a prosecutor has used language which either directly or indirectly refers to the defendant's failure to testify. It is not every comment about a defendant that is proscribed, but merely comment on his failure to testify. We have carefully examined the prosecutor's entire final argument, including the passages to which our attention has been directed by defense counsel, and are unable to find that the prosecutor in any way commented on defendant's failure to testify. Under such circumstances there was no error in denying defendant's motion for a mistrial.

## IV. Jury Instructions
### A.

■ As we have also noted earlier, the State's witness, David Ward, testified that at the behest of defendant he had initially lied to the police. Only after receiving defendant's admission of the killing and after then talking with his parents and consulting an attorney did Ward return to the police to reveal fully what he knew. Meanwhile, Ward's attorney had obtained a letter from the Attorney General's office, which in pertinent part read as follows:

> In return for the opportunity of discussing such matters with your client, and pursuant to your request, the State of Maine hereby agrees that with respect to such discussions no statements made by your client, David Ward, during these discussions will ever be introduced into evidence against him in any criminal proceeding. The State is no way limited by this representation, however, from continuing to pursue its criminal investigation into the death of George Fredericks, nor is the State limited from bringing any charges against your client, irrespective of statements made by him, should the State determine that your representations as to your client's lack of criminal responsibility are not accurate, subject only to the continuing representation that any statement made by Mr. Ward will not be introduced into evidence against him.

On cross-examination, Ward denied being granted immunity but stated that he had

---

1. During his closing argument, the prosecutor discussed the testimony of defendant's girl friend in part as follows:

   What does Richard McEachern say as he comes through the door that night to Laurie Hathaway about his gun? He says, I sold it. Now I sold it to Bobby Brown. Maybe Bobby Brown committed the homicide, that's what he wants you to think, I guess. . . . I suppose he could have said John Smith but Bobby Brown probably sounded like a more realistic name. Bobby Brown now has got the gun from New Jersey.

And in summing up his closing argument, the prosecutor said:

   So I ask you not to compromise your verdict. I think you can draw rational inferences from the testimony and the evidence Richard McEachern is not telling the truth through his alibi witness and his evidence, that he was, in fact, there on November 2, 1978. And you can come back with no other verdict but that he is guilty as charged. I thank you.

received a letter "to the effect that what I said in the court wouldn't be used against me if charges were ever brought against me." On redirect examination, the State, after clarifying that Ward was not immune from prosecution, placed the Attorney General's letter in evidence.

Defendant submitted a proposed instruction concerning the testimony of immunized witnesses. The proposed instruction referred to witnesses who had been granted immunity from prosecution. The presiding justice declined to give that instruction. Contrary to defendant's claim on appeal, we find no error in that refusal since whatever was the significance of the Attorney General's letter, it clearly was not a grant of immunity from prosecution and therefore the instruction proposed was incorrect.

In charging to the jury, the presiding justice explained the difference in concept between transactional immunity and use immunity. He then instructed the jury as follows:

> Now if you find someone actually got some kind of immunity, then it's proper for you to consider that when evaluating the credibility or the weight to give to that person's testimony. And it's for you to say, assuming you find there was some immunity, did that affect the testimony given to you in any way here under oath. That's a factual thing for you, the Jury, to determine. And when there is shown to be some immunity, it's something that you should look into and make a finding of determination.

Defendant contends that the court committed error by leaving to the jury the determination of whether the immunity granted was transactional immunity or use immunity, asserting that it was the responsibility of the presiding justice to rule on the legal effect of the letter that had been received in evidence and then to instruct the jury as to how they should consider that letter in evaluating Ward's credibility.

At the conclusion of the presiding justice's charge, defendant made no objection to the charge on the immunity question. The court had held a conference with counsel before instructing the jury and did advise them as to its ruling on their various requests. In explaining to defense counsel that the court would not give defendant's proposed instruction on immunized witnesses, the presiding justice explained that he would instruct the jury as he later in fact did. Counsel did not then assert that it was the presiding justice's responsibility to rule as to the nature of the immunity rather than leaving it to the jury. Instead, defense counsel asserted that the court should not explain the two types of immunity because the jury would be left with the impression that because the witness did not get full immunity from prosecution, he had less reason to color his testimony. It is obvious that defendant did not desire the court to instruct in detail on the nature of the immunity granted, since had the court done so it would have had to advise the jury that the Attorney General's letter had extended only use immunity.

Defendant having failed to call to the court's attention the error in the court's instruction of which he now complains, we review that error under the obvious error standard of M.R.Crim.P. 52(b). We analyze defendant's claim of error on two distinct and inconsistent assumptions.

■ Assuming first that there had been an effective grant of use immunity to Ward, the presiding justice committed error in leaving to the jury the determination of the nature of the immunity granted rather than advising them that Ward had been granted use immunity. However, that error did not prejudice defendant since the instruction was more favorable to defendant than a correct instruction would have been. Under the court's instruction the jury was free to conclude that Ward had been granted immunity from prosecution and thereby conclude his testimony was influenced significantly by the grant of immunity. A proper instruction would have explained the limited nature of the grant of immunity and would have thereby lessened the impact in the jurors' minds of the grant of immunity on Ward's credibility.

The foregoing analysis is based on the assumption that there had been an effective grant of immunity. In fact, no legally effective immunity had been granted at all. 15 M.R.S.A. § 1314–A (1980) authorizes the court, upon appropriate motion and under very limited circumstances, to grant immunity from prosecution to a witness. There is no statute which authorizes the Attorney General, members of his staff, or any other officer to grant immunity to witnesses, either transactional immunity or use immunity. Neither a prosecuting attorney nor any other officer of government has any inherent power to grant immunity; that power exists only by statute. *State v. Brown*, Me., 321 A.2d 478, 484 (1974). Since the purported grant of immunity to Ward was ineffective, the instruction given was more favorable to defendant than a correct instruction would have been.

### B.

As noted above, David Ward, the State's witness, had at first given a story to the police inconsistent with his testimony on the witness stand. He had, however, fully explained in his testimony the reason for the inconsistency. Defendant submitted a proposed instruction on impeachment of a witness through proof of a prior inconsistent statement. In the conference with counsel concerning instructions before he charged the jury, the presiding justice, alluding specifically to defendant's proposed instruction concerning impeachment through the use of a prior inconsistent statement, stated:

> I'm not going to be following the language that you've used here because I find some of it a little bit misleading, capable of confusion, you'll have to watch what I cover and make sure you feel I've covered the law on that in my own regular charge.

In his charge to the jury the presiding justice devoted some six pages of the transcript to lengthy and comprehensive instructions on the evaluation of the testimony and the various methods by which witnesses could be impeached. The jury was instructed fully on the methods of evaluating the testimony of witnesses. The court did not expressly instruct the jury that if it once found a witness had knowingly made a false statement about a material matter it was thereafter free to disregard all of that witness's testimony. Specifically referring to a witness who was shown to have made a prior inconsistent statement, the presiding justice instructed the jury that "the testimony of [such] a witness may be discredited or impeached by that showing that the witness previously made a statement which was inconsistent with his present testimony in front of you." While the last paragraph of the court's charge on this subject is somewhat unclear,[2] the charge viewed in its entirety could not have left the jury with any misapprehension that it was free, if it wished, to disregard all or any part of Ward's testimony. As this court has often stated, *e. g.*, *Towle v. Aube*, Me., 310 A.2d 259, 266 (1973), the trial judge need not instruct in the exact words submitted by a party.

Although invited both before the charge and after it to make any objections and having been specifically admonished to listen with care to the presiding justice's instruction on prior inconsistent statements, defense counsel made no objection to the charge at its conclusion. Again, we must review the alleged error in instructions under the obvious error standard of M.R. Crim.P. 52(b). Applying that standard, we must declare that error in this portion of the charge, if there was any, did not rise to the level of reversible error.

The entry is:

Judgment affirmed.

All concurring.

---

**2.** The last paragraph of the presiding justice's charge to the jury stated in pertinent part:

> [I]t's for you to first find out in your minds factually whether or not the witness did make prior inconsistent statements. And if you find the witness did, then it's for you to determine whether that fact, all or part or none of the testimony given in front of you as to the credibility and that's factual use of that for the jury and nobody else.